Stearns, J.
On December 12, 1990, an Amtrak passenger train, with an undersupervised apprentice engineer at the controls, failed to brake while entering Back Bay station. The Amtrak train careened into the rear of a Massachusetts Bay Transit Authority commuter train. The plaintiff Barbara Rotman, was a passenger on the MBTA train.
Amtrak concedes liability for the accident. The only issue remaining for trial is damages. Ms. Rotman alleges that the impact threw her forward in her seat, causing her to strike her head. Prior to the accident, Ms. Rotman had been diagnosed with multiple sclerosis [MS]. Among her symptoms were recurring attacks of optic neuritis, a form of acute transitory blindness not uncommon in MS patients.
Ms. Rotman contends that the trauma to her head induced an episode of optic neuritis several hours after the accident. There is no dispute that Ms. Rotman had experienced previous onsets of optic neuritis unrelated to any trauma. To establish the necessary link between the trauma and the onset of her symptoms, Ms. Rotman relies on the opinion of Dr. Shirley Wray, a board certified neurologist and Harvard Medical School professor. Again there is no dispute as to Dr. Wray’s impressive expertise in the field of neuro-visual disorders. Her research under the auspices of the National Institute of Health is internationally recognized. Ms. Rotman is a patient of Dr. Wray’s and is one of the clinical subjects whose case has figured in Dr. Wray’s published studies.
Dr. Wray is of the opinion that trauma can exacerbate preexisting multiple sclerosis optic neuritis either by disturbing the blood-brain barrier or by triggering a change in the patient’s immune system. Of the two possibilities, Dr. Wray is inclined to the former (as she believes are many of her colleagues), although she concedes that there is, as yet no empirical means of confirming such a causal relationship or identifying *564 those patients, among them Ms. Rotman, in whom such a causal relationship may exist. Dr. Wray believes that advances in magnetic resonance imaging [MRI] technology will eventually supply a means of validating her hypothesis. As yet, insufficient autopsy data has been compiled to permit her to state with any certainty that trauma is the effective cause of optic neuritis in patients like Ms. Rotman.
On October 25, 1993, a voir dire of Dr. Wray was held. The significant portions of her testimony are as follows:
Q. (By Mr. Farrell) Now Doctor, has anything occurred since September the 23d of this year which would make you change your opinion?
A. I believe that I followed up in my deposition by saying that although we don’t have scientific evidence, by that we mean we don’t have autopsy data of brain and optic nerves taken immediately after trauma to identify evidence of acute lesions, we are moving into an area where, with the imaging of MRI, we might anticipate to see sharing injuries opposed to trauma, and on that basis, I felt that I had new data, new scientific knowledge that might support my contentions that, my opinion that Barbara Rotman’s episode of loss of vision was and is probably related to the trauma.
Q. If I understand your testimony, you are stating that as MRI progresses, and is enhanced, and becomes more certain, that you feel that some day in the future your opinion, along with that of Dr. Charles Poser, will be confirmed?
A. Yes.
Q. Okay. But there is no confirmation of those opinions at the present time; would you agree with that?
A. Correct.
Transcript at pp 7-8.
Dr. Wray: I now have what I consider new scientific knowledge to support the probability that in [Ms. Rotman’s case] it was a breakdown in [the] blood-brain barrier [caused by the trauma of the crash],
Q. (By Mr. Farrell) And that is the evidence you suggested before, that some day in the future, as MRI progresses, your opinion will be confirmed?
A: Yes.
Q: But it is not confirmed today?
A: We already have MRI cases showing the sharing artifact of trauma. We don't have it in [Ms. Rotman’s] case, but we have it other cases.
Transcript, at 19-20.
Q. (By the court) The point you are making is, as yet, there is no empirical means of confirming the nature of the causal relationship, or even to identify those cases where such a causal relationship exists opposite from those [in] which it doesn’t?
A. Yes. That is correct.
Transcript, at 22-23.
In summary, Dr. Wray bases her opinion that trauma may explain Ms. Rotman’s post-accident onset of optic neuritis on her expectation that validating data may soon be available and upon the temporal coincidence between the crash and Ms. Rotman’s loss of vision. Id.
Before the court is defendant Amtrak’s motion in limine seeking to exclude Dr. Wray’s expert opinion. Amtrak contends that Dr. Wray’s opinion is based (at best) on informed guess or conjecture and is unsupported by any reliable scientific evidence.
DISCUSSION
Both parties have framed the admissibility of Dr. Wray’s opinion under Proposed Mass.R.Evid. 702, the analog to Fed.R.Evid. 702, rather than the test of Frye v. United States. 293 F. 1013 (D.C.Cir. 1923). The Frye rule is followed in Massachusetts. See Commonwealth v. Mendes, 406 Mass. 201, 205 (1989); Commonwealth v. Daggett, 416 Mass. 347, 350 (1993). Under Frye, expert opinion based on a methodology that diverges “significantly from the procedures accepted by recognized authorities in the field . . . cannot be shown to be ’generally accepted as a reliable technique.’ ” Frye, supra, at 1130.
In Daubert v. Merrell Dow Pharmaceuticals, Inc., 113 S.Ct. 2786 (1983), the Supreme Court abandoned the Frye general acceptance test, noting the considerable academic criticism of Frye’s ultra-orthodox approach, and finding it superseded by the more liberal relevancy test of Rule 702. “That the Frye test was displaced by the Rules of Evidence does not mean, however, that the Rules themselves place no limits on the admissibility of purportedly scientific evidence ... The subject of an expert’s testimony must be ‘scientific . .. knowledge.’ . . . [T]he word ‘knowledge’ connotes more than subjective belief or unsupported speculation . . . Proposed testimony must be supported by appropriate validation — i.e., ‘good grounds,’ based on what is known . . . Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested. ’Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry.’ ” Moreover, “Rule 702 further requires that the evidence or testimony ’assist the trier of fact to understand the evidence or to determine a fact in issue.’ ’’ Daubert, supra.
My concern with Dr. Wray’s opinion rests not with her credentials or with the methodology on which she hopes to rely (MRI) in attempting to validate her hypothesis that trauma can induce the onset of optic neuritis in MS patients. The problem lies rather with the fact that as yet no test of the hypothesis has been (or perhaps can be) carried out. Dr. Wray’s opinion is exactly that. A very good one, no doubt, but absent any validation, no better or worse than the dissenting opinions of many of her equally esteemed colleagues. *565 Scientific opinion is not scientific knowledge, as the Supreme Court recognized in Daubert. I am also concerned that Dr. Wray’s as well as defendant’s experts opposing opinions would fail the second of Rule 702’s tests, that of providing assistance to the jury in resolving a fact in dispute. At best a jury on the evidence that I heard would be asked to chose between two opinions, both equally credentialed, but lacking any factual underpinning. Daubert is instructive on this point. The issue in Daubert was not scientific orthodoxy versus unsupported upstart heterodoxy, but scientific orthodoxy versus an upstart opinion that as the Supreme Court observed had marshalled the support of eight “impressively credentialed” experts whose conclusion that Bendectin can cause birth defects was based on test tube and live animal studies as well as a critical reevaluation of the published human studies. A jury in this case would not be asked to evaluate the substance that underlies conflicting scientific hypotheses, as Daubert envisions, but to choose between conflicting theories stripped naked of the validating data that a reputable scientist would insist upon before making a similar choice.
Of even greater concern is the fact that a jury, even if convinced that Dr. Wray is correct, that trauma can induce MS related optic neuritis, would have no basis on which to connect that opinion to Ms. Rotman’s case. Dr. Wray in her testimony conceded as much. Without a showing of proximate cause on this element of damages, plaintiffs case fails as a matter of law. See Imbimbo v. Ahrens, 360 Mass. 847, 848 (1971); Carter v. Flintrol, Inc., 720 S.W.2d 337, 339 (Ark.App. 1986); Providence & Worcester Railroad Co. v. Chevron U.S.A., Inc., 416 Mass. 319, 323 (1993).
ORDER
For the foregoing reasons, defendant Amtrak’s motion in limine is ALLOWED.