Brassard, J.
Defendant John Dinnall (Dinnall) is charged with six counts of rape of a child, G.L.c. 265, §23; four counts of indecent assault and battery of a child under fourteen, G.L.c. 265, §13B; and one count of open and gross lewdness, G.L.c. 272, §16. Presently before this Court is Dinnall’s motion to admit into evidence expert testimony regarding results from a polygraph test administered to him by Mr. Delton Record, Jr. (Mr. Record). A hearing was held on September 17, 1997. At the hearing, the defendant offered the testimony of Mr. Record, and six exhibits. The prosecution did not call any witnesses or offer any documentary evidence. For tire reasons stated herein, Dinnall’s motion to admit Mr. Record’s testimony regarding the polygraph results is DENIED.
FACTS
Based on all of the credible evidence, the Court makes the following findings of fact:
1. Mr. Record has been a professional polygraph examiner since November 1977 when he completed a course of study at the Backster School of Lie Detection in San Diego. He has attended a number of courses since that time. He has performed some 6,500 polygraph examinations on behalf of defense attorneys, law enforcement agencies, and others.
2. Mr. Record conducted a “blind control” study of twenty-two subjects between August 9, 1996 and May 7, 1997. Each of the twenty-two subjects received a polygraph examination that was administered by Mr. Record. The “target” or relevant question for each of the subjects was whether that person had been charged with a sex related crime. The study was blind because Mr. Record did not know who had in fact been charged at the time of the administration of the examinations. All of the examinations were conducted in the office of a Salem attorney. The examination had to be discontinued with respect to one individual. As to the other twenty-one, ten in fact had been charged with a sex related crime and eleven had not been so charged.
3. Mr. Record employed the Backster zone of comparison technique to all of these examinations. Mr. Record testified that this technique is widely used. He employed what he termed neutral questions, controlled questions, relevant questions, and symptomatic questions. Mr. Record did not fully define all of these terms or the zone of comparison technique. Mr. Record used polygraph equipment which he purchased in 1986. This equipment measures three indices: respiratory, changes in cardiovascular activity, and galvanic skin response. Mr. Record did not explain these indices in any detail. Mr. Record testified that the underlying principle to the polygraph exam is that as a person lies he or she has a physical response to the fear of being detected in deception. He further testified that the polygraph equipment monitors the physical response of the person being examined so that the examiner can attempt to determine whether the person being examined is being deceptive.
4. Dinnall was one of the twenty-one participants in the study. Dinnall had in fact been charged with a sex related crime prior to participating in the study. However, during the study, Mr. Record was not aware that Dinnall was charged with a crime. As part of the study, all the subjects were instructed to tell Mr. Record that they had not been charged with a sex related crime. Accordingly, in his polygraph examination, Dinnall told Mr. Record that he had not been charged with a sex related crime. Mr. Record concluded that Dinnall was being deceptive when he stated that he had not been charged with a sex related crime. The defendant was also tested by Mr. Record subsequent to the study involving the twenty-one *460 individuals. In the latter testing, Mr. Record was aware that the defendant had actually been charged -with a sex related offense. In the second polygraph test, Mr. Record asked Dinnall if he had committed a sex related offense. Mr. Record concluded that the defendant was truthful in his denial of the commission of the sex related crime with which he stands charged.
5. On cross-examination of Mr. Record, the following testimony was adduced. Mr. Record has no degrees in science, biology, statistics or any other field. Mr. Record’s study of the twenty-one individuals is unpublished as of this time. Mr. Record has not read any of the studies questioning rates of accuracy with respect to polygraph examinations. Mr. Record generally does not read such published studies. Polygraph standards are established by the accredited polygraph schools. These schools are accredited by the American Polygraph Association. Mr. Record is not aware of any federal or state regulations with respect to polygraph examinations.
6. On cross-examination Mr. Record further testified that after interviewing each subject, and learning about that person’s background, health, employment history and other relevant factors, Mr. Record formulates control questions for that person. What may be an appropriate control question for one person may not be an appropriate control question for another person. Mr. Record did not videotape or otherwise record the interview sessions he had with the twenty-one subjects.
7. Mr. Record testified on cross-examination that he had no idea as to how the twenty-one participants in the study were chosen. Mr. Record also testified that it is possible for a subject to employ what he termed “countermeasures,” in an effort to defeat the polygraph test. Kinds of countermeasures include ingesting certain drugs prior to the examination or inducing pain during the exam. Mr. Record believes that such countermeasures are relatively easily detected by him and he seeks to monitor such measures during his examination.
8. Mr. Record further testified that as to the twenty-one subjects, he was able to determine accurately the truthfulness or deception of eighteen of those subjects with respect to the target question as to whether the individual had been charged with a sex related crime. The responses of three of the subjects were inconclusive, but Mr. Record’s inclination was to conclude that they had been truthful, and in fact those three had responded truthfully. Mr. Record further testified that he would expect even more accuracy and reliability with respect to a more charged and intense target question such as whether an individual had actually committed a sex related offense.
9. Mr. Record testified on cross-examination that his study had not been independently verified.
10. On review of the exhibits, the Court notes the following:
a. Exhibit 4 describes and summarizes the study conducted by Mr. Record. It indicates that each of the subjects who had not been charged with a sex related offense was given a hypothetical sex related fact pattern to relay to Mr. Record. The exhibit indicates that three of the subjects’ polygraph results were inconclusive. Further, the exhibit notes that all the individuals whose results were inconclusive had used the name of someone close to them as the name of the victim in their hypothetical sex related fact pattern. There is no evidence before this Court regarding whether the test results may have been impacted by the hypothetical fact patterns assigned. However, the exhibit suggests that the three inconclusive results were inconclusive as compared to the other results due to the subjects’ use of the name of someone familiar. This information appears to undermine the reliability of the study.
b. Exhibit 3 indicates that only seventeen of the twenty-one subjects gave an appropriate release to Mr. Buso, the Salem attorney, for their criminal records to the Criminal History System’s Board. Thus, as to four of the twenty-one subjects, there was apparently an inability to verify whether or not that person had been previously charged with a sex related offense. This also calls into question the reliability of the study.
c. The statistical assessment by Professor Glickman, Exhibit 2, purports to assess the reliability of Mr. Record’s study. Exhibit 2 indicates that for the purposes of assessing the reliability of Mr. Record’s study, Professor Glickman assumed that the polygraph examination would be eighty-five percent successful in assessing deceptiveness accurately and eighty percent successful in assessing truthfulness accurately. He bases this assumption on two studies, neither of which are before the Court. The exhibit explains that one can predict the probability that a defendant is actually innocent in a case where the polygraph chart indicates innocence by employing the following formula:
Pr(D S) = Pr(S D)(l — Pr(D))
Pr(S D)(l-Pr(D) + (1 — Pr(S D) Pr(D)
There was no testimony or other evidence provided to the Court to explain the statistical assessment performed by Professor Glickman. Moreover, the statistical assessment offered to the Court is not readily understandable by one not trained in statistics.
DISCUSSION
Prior to 1994, the Supreme Judicial Court followed the “general acceptance” test when determining whether to admit expert testimony based on scientific knowledge. The definition of this standard was enunciated in Frye v. United States where it was held that “while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discoveiy, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.” Frye v. United States, 293 F. 1013 *461 (D.C. Cir. 1923). Following Frye, the Supreme Judicial Court held in Commonwealth v. Mendes, that poly-graphic evidence was inadmissible because the “hope that polygraphy would mature to the point of general scientific acceptance has not materialized.” Commonwealth v. Mendes, 406 Mass. 201, 212 (1989).
In 1993, the Unites States Supreme Court determined that the Frye test had been displaced by the adoption of Rule 702 of the Federal Rules of Evidence. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993). Federal Rule 702 is the same as the proposed Massachusetts Rule 702 and provides as follows:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
In Daubert, the Court explained that general acceptance by the scientific community was no longer the sole test for admission of expert testimony based on scientific knowledge. Instead, the Court noted that “the inquiry envisioned by Rule 702 is, we emphasize, a flexible one. Its overarching subject is the scientific validity-and thus the evidentiary relevance and reliability-of the principles that underlie a proposed submission." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. at 594-95. Whether the theory or technique had been tested, reviewed by peers, or published are factors for courts to consider in assessing reliability. Id at 593-94.
The Supreme Judicial Court adopted the Daubert reasoning in Commonwealth v. Lanigan, 419 Mass. 15, 26 (1994). The Court stated that general acceptance in the relevant scientific community would continue to be an important factor and often the only issue in determining admissibility. However, the Court stated “(w]e accept the idea . . . that a proponent of scientific opinion evidence may demonstrate the reliability or validity of the underlying scientific theory or process by some other means, that is, without establishing general acceptance.” Commonwealth v. Lanigan, 419 Mass. at 26.
In the wake of Lanigan, the Supreme Judicial Court reviewed its prior holding on admissibility of poly-graphic evidence in light of the more flexible “reliability” test for admission of expert testimony based on scientific knowledge. In Commonwealth v. Stewart, the Court noted that the defendant had failed to show by “proposed proof or by reference to scientific or legal publications, that the perception of the reliability of polygraphic evidence has, for good reason, changed significantly since our Mendes decision.” Commonwealth v. Stewart, 422 Mass. 385, 389 (1996). However, the Court acknowledged that the reliability of polygraphic evidence may be established without proving general acceptance in the scientific community. The Court stated that for polygraphic evidence “to be admissible in a given case, it seems likely that its reliability will be established by proof in a given case that a qualified tester who conducted the test had in similar circumstances demonstrated, in a statistically valid number of independently verified and controlled tests, the high level of accuracy of the conclusions that the tester reached in those tests.” Commonwealth v. Stewart, 422 Mass. at 389.
In the present case, the defendant has failed to establish by proof or publications that polygraphy has been accepted by the relevant scientific community. Therefore, this Court must determine whether the defendant has proved the reliability of the polygraphic evidence at issue, by other means, as set forth in the Stewart opinion.
Mr. Record, the tester in this case, has been a professional polygraph examiner for twenty years and has administered thousands of polygraph exams during that time. Based on his qualifications and testimony, I find him to be a qualified tester. Further, he was apparently able to determine accurately the truthfulness of eighteen out of twenty-one subjects in his study. The subjects were, however, instructed how to answer. Moreover, eleven of the subjects were instructed to transmit hypothetical information. This study was not conducted in circumstances similar to the polygraph examination at issue.
Similarly, this Court concludes that Mr. Record did not conduct a statistically valid number of tests. He has conducted, with perhaps a statistically valid number of subjects, one test. Furthermore, the Stewart opinion requires a showing that the tester conducted a statistically valid number of independently verified and controlled tests. Stewart, supra at 389. There is no evidence before this Court demonstrating that the polygraph exams in the study were independently verified and controlled. Further, Mr. Record testified that the study was not independently verified. To the extent that Professor Glickman’s assessment of the study, exhibit 2, is offered as independent verification, I find that it fails in that regard. Professor Glickman’s assessment does not address how the individual polygraph exams were conducted nor does it address verification of the results of the individual exams.
In conclusion, I find that the defendant has failed to establish the reliability of the polygraphic evidence at issue in accordance with the standard enunciated in Stewart. Therefore, this Court is compelled to exclude from evidence Mr. Record’s testimony regarding Dinnall’s polygraph test results.
ORDER
For all the reasons stated, it is hereby ordered that the defendant’s motion to admit expert opinion evidence regarding polygraphy results be DENIED.